No. 35,992

CARL MILTON GOSS, *Appellee*, v. McJUNKIN FLYING SERVICE, *Appellant.*

(143 P. 2d 659)

Opinion filed December 11, 1943.

*Glenn Porter,* of Wichita, argued the cause, and *Getto McDonald, Dwight S. Wallace, William Tinker* and *Arthur W. Skaer,* all of Wichita, were on the briefs for the appellant.

*Richard W. Mason,* of St. Joseph, Mo., argued the cause, and *C. H. Brooks, Howard T. Fleeson, Homer V. Gooing, Wayne Coulson, Paul R. Kitch,* all of Wichita, and *Maurice L. Mason,* of St. Joseph, Mo., were on the briefs for the appellee.

The opinion of the court was delivered by

HOCH, J.: From a judgment approving an award under the workmen's compensation law the respondent appeals. The only question presented is whether the appellee was an employee of the appellant and working in the course of such employment when the injury occurred.

Our jurisdiction under the workmen's compensation statutes (G. S. 1935, ch. 44, art. 5) is specifically limited to "questions of law." (See proviso in G. S. 1935, 44-556.) Not being triers of fact as is the district court, we do not weigh conflicting evidence. (*Cook v. Dobson Sheet Metal Works et al.,* ante, p. 576, 142 P. 2d 709; *McMillan v. Kansas Power & Light Co.,* ante, p. 385, 139 P. 2d, 854, and cases therein cited.) We consider the evidence only for the purpose of determining whether, as a matter of law (*Cook v.*

*Dobson,* supra, and cases there cited), there was any substantial evidence to support the judgment. It is elementary that upon such review the appellee is entitled to all reasonable inferences which may be drawn from the evidence in his favor.

The McJunkin Flying Service, Inc., operates in Wichita, Kan., a school for the training of fliers. Carl Milton Goss was riding in one of their planes on September 15, 1942, when the plane crashed and he was seriously injured. Goss filed application for compensation under the workmen's compensation law and on January 6, 1943, the commissioner made an award in his favor in the total sum of $1,008, covering 56 compensable weeks at $18 per week. The claimant was also awarded $654.35 for hospital, medical and nursing bills and administration fees. On appeal to the district court the award was approved and judgment entered on June 15, 1943. Neither the nature and extent of appellee's injuries nor the amount of the award are at issue and need not be discussed.

Having reviewed the record in the light of appellant's contention that there was no substantial evidence to support the judgment we summarize only the evidence upon which appellee relies.

Appellee had been a resident of Missouri for a number of years and prior to September 15, 1942, was employed as an aircraft flight instructor by the Ong Aircraft Corporation in Kansas City, Mo. He went to the C. P. T. office in Kansas City (said to be a division of the Civil Aeronautics Authority) and told them he was planning to leave the service of the Ong school, that he had an "instrument rating" and wanted to get a new position. Several schools were suggested where he might get employment as an instrument instructor. He went back to the airport and in about an hour thereafter had a long-distance call from the McJunkin Flying Service of Wichita. Meredith Jocelyn, one of the operators of the McJunkin Flying Service, talked to him and asked him if he was interested in an instrument instructing job and said, "How about coming down and going to work?" He told Jocelyn that he had an instrument rating and was qualified to teach it, and liked Wichita all right, and they discussed salary. Jocelyn named a price and Goss named his and they split the difference, agreeing on $325 a month. Goss testified that this salary "was to start the day I arrived at the airport in Wichita at the school." Jocelyn told him that they had a course starting September 15 and Goss told him that he had several students and wanted to finish the work with

them, but that he would get to Wichita as soon as possible. He called Jocelyn on the 'phone several days prior to the 15th and told him he was ready to come and asked if they still wanted him. He replied that they did, that they were expecting him, that the job was still there and for him to come on. He told Jocelyn that he would be there on Sunday or Monday. He arrived in Wichita about 4:30 p. m. on Sunday afternoon, September 13; reported to the airport on Monday morning, September 14, and talked to Vale Jackson, secretary to Mr. Theis and Mr. Jocelyn, operators of the school, who told him that they were out of town and would not be back until the following day. She said that their students were not expected until the 15th and had not arrived and they were "expecting a Link trainer" which was late in arriving and that in the meantime there was not a great deal for him to be doing. It should be noted that there was no showing that Miss Jackson had any authority to hire employees or to direct the work of employees. Both Theis and Jocelyn testified that she had no such authority. She was, however, the only one in the office and no objection was made to testimony concerning the conversation which was had with her. Appellee told her that he had considerable work to do on the "radio range" getting ready for the instrument course, and if there was any other instructing he would be glad to do it and for her to feel free to call on him. She said there might be other instructing to do and other "flight primary, and outside flight, until the instrument program got started." Concerning the nature of the work on the "range," appellee testified as follows:

"Instrument flying is different from just straight flying, and in flying instruments a radio range is used. In order to make it easy for the students and easy to teach, it is a good idea to have a pattern of those ranges drawn up. When we teach instruments it is customary to make copies of the range so that the students can see where they are. In other words we made a recorded flight on that sheet and figured out the altitude to fly and such as that. There is a radio range in Wichita. In instrument flying you have to fly in different altitudes, and it is different in different airports, and due to the difference in sea level, it has to be figured out."

Appellee remained at the airport on the 14th until early in the afternoon, when he left in order to locate a rooming place. He returned to the company's office about 11:00 o'clock in the morning of the 15th. Much of the time while he was at the office on the 14th and 15th he was engaged in work on the radio range. On the afternoon of the 15th both Theis and Jocelyn came in, met appellee

and said they were glad he was there. They said they had been out of town buying airplanes and that "the Link" was still late and they expected it in a week. One of them said that one or two of their students had arrived; that "there was some primary to teach"; that appellee wouldn't have a. lot to do until the course started, but "to stick around."

On direct examination Theis was asked, "He (Goss) also said that in this first conversation, one of you said something about sticking around, there would probably be some primary training to do until the Link trainer was installed?" He answered, "That is possible. All of our instructors have to do whatever work there is there to be done." Concerning the work on the range which appellee was doing Jocelyn testified upon cross-examination as follows:

"Q. When you first met Mr. Goss personally, he was sitting in your office inside the office? A. That is correct.

"Q. I believe you stated he told you he was working on the radio range? A. He was working on a radio range problem.

"Q. As a part of the instruction it is necessary that the instructor understand the radio range? A. Yes, but I don't know that it was a Wichita range on which he was working. We just noticed a sheet with a range drawn out on it.

"Q. He stated he was working on the range? A. I don't recall that we had any conversation with regard to the range problem, or whether we did or not. I knew he was working on a sheet with a range drawn out on it. Whether it was discussed or not, I am not clear on it. I don't remember."

While appellee was working on the radio range Jim Harper, one of the company's students, asked him if he would go up with him. Appellee said he was busy and did not have time, as he wanted to leave early. Harper, however, insisted that he go with him, saying that he had about seven or eight hours to fly before getting his instructor's rating and he wanted appellee to go up "and check me out on some maneuvers and more or less 'sandbag.'" The term "sandbagging" was explained to mean much the same as the use of ballast in a ship. Appellee told Miss Jackson that he was going up with Harper and that he would be back in about an hour, and she said, "All right." The two "went out and took off."

There was testimony that since the war began every civilian aircraft has to be cleared by a licensed government registrar before he can take off, and that the record of the flight plan for this flight was made out before the flight started. On this point appellee testified:

"Q. And where was that flight plan made? A. It was made at the office there, I think. At Wichita, I am not very familiar how they do. I think the control tower at the airport controls the clearance for Hart's Flying Service and for McJunkin and other airplanes operating off the airport, you call in and give them the details of your flight.

"Q. Were there papers signed? A. Yes, sir.

"Q. Who signed them if you know? A. That I cannot say.

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

"A. I said a moment ago I did not sign the papers. Mr. Harper made out the clearance as pilot and on the clearance it says passenger. My name was passenger there, and the registrar had to sign the clearance before we could leave, and we had to take a copy of the clearance with us on the flight.

"Q. Where was that clearance paper made out? A. Well, as Mr. Harper made it out—

"Q. Where? In the office of the McJunkin Flying Service or somewhere else? A. I imagine it was in the office. There is Mr. Harper, he can tell you.

The Examiner: "I would like to know who the registrar is.

"Q. Do you know who the registrar is? A. That I do not know, but every approved airport must have one."

Jocelyn testified that a Mr. Hobbs was in charge of the school while he and Mr. Theis were absent; that Hobbs was their chief instructor, was their clearance officer and responsible for the office and for the use of the planes.

Jocelyn testified that his information concerning appellee first came from John Tevis, who was in the C. A. A. office in Kansas City, and that Tevis left a note stating that Goss was an instrument instructor and was looking for a job as such. He testified that when he called appellee on the phone he told him that he understood from Tevis that he would be available as an instrument instructor; that he asked him where he had had his training and when told that it was in Denver he said that "they had a very good reputation." He testified that they agreed on salary and that he told him that they would need him on or about the fifteenth of September and for him to come on down and they would go over his ratings.

Appellant's principal contention is that while it had agreed to employ appellee such employment was contingent upon examination of his credentials to see that he was qualified for the particular work for which they needed an instructor, and that the law required an examination of the credentials, which they had not yet made. In support of this view appellant stresses Jocelyn's testimony that when he and Theis met appellee in the office they asked him to wait a while, that they had some other business and "would talk to him later." He did not testify that he told appellee what it was he

wanted to talk about later, nor that he told him they would have to check his credentials. Furthermore, Jocelyn testified on cross-examination that it was no violation of the law for an instructor to make a flight before his credentials were examined, and that they make such a check to satisfy themselves and not to satisfy the C. A. A.—the federal authority having regulatory control in such matters. Also, that he learned from the C. A. A. itself that appellee was available as an instructor. In any event the trial court heard the testimony concerning the conversation in the company's office and whatever conflict there may have been was resolved in favor of appellee.

Stressing the elementary principle of contract that there must be a meeting of the minds on all essentials appellant contends that there was no evidence upon which to base a finding that agreement had been reached and employment begun. We are unable to agree with the contention. While the evidence might have been more clear-cut—in which case this litigation probably would not have arisen—we cannot say that the trial court erred in finding that the appellee's employment had begun. Appellant was seeking a flying instructor; from the C. A. A. it learned that appellee was available for that purpose; they had agreed upon salary which was to begin the day appellee arrived at the airport; for parts of two days appellee worked upon the radio range in appellant's office, and was told by Jocelyn "to stick around," with no intimation to him that they wanted to examine his credentials; there was testimony that the flight plan for this particular flight was properly cleared and at least some inference that such clearance was had through Hobbs, appellant's officer responsible for the office and for use of the planes. The latter testimony may seem somewhat inconsistent with Harper's testimony that few other men were using that particular plane and it wasn't necessary to go into the office and report every flight he was going to make. However, we cannot say that there is irreconcilable conflict on the question of whether there was regular clearance for this particular flight and even if there were the trial court was trier of the fact. We cannot upset the finding that appellee's employment had begun.

Appellant next asserts that the accident did not occur in the course of employment, but does not argue the point in its brief. We also conclude that this point is not well taken. Appellee was being employed as an instructor. Appellant does not contend that he

was not properly qualified as such. It merely asserts that it does not know, not having examined his credentials. On the other hand, there was ample testimony that he had the proper rating and was qualified to instruct. However unfortunate the crash and whatever inferences anyone might possibly draw from it, the fact remains that appellee was taken up by Harper in part at least because he was qualified to instruct and to check some of the maneuvers. Assuming appellee to have been in the employ of appellant as instructor, we think it cannot be said as a matter of law that the accident did not take place in the course of employment.

Whether, upon the same record, the trial court might have found for appellant is, of course, not before us.

We find no error and the judgment is affirmed.